INVENTORY OF EXHIBITS SUBMITTED AS OF *12-8-17*

PAGE 2

EXHIBIT #                          item

29. Undated Letter Michelle Norsworthy-Transgender Prison Rape
    victim, As published by Just Detention International

30. Norsworthy v. Beard 87 F. Supp. 3d 1164,re: sexual reassignment

31. Treatment Plan,Habilitation Program Fed. BOP 9-25-05

32. Page 2 of exhibit #31

33. Administrative remedy informal re;involuntary transfer,PREA

34. E-mail to Case Manager FCI Marianna( male) re:Transfer to a
    Female prison 1/20/16

35. Letter from Just Detention International,dated 4-18-16, re:
    transgender prisoners,possible transfers to women's prisons

36. BOP-Official Transfer request form J.S. Walton Warden 1-10-14

37. Response Administrative remedy 845404-A1, 1-18-17

38. Central office remedy appeal#845404-A1 re: Houseing safety issues
    dated 3-2-16

39. Page 103-of Book Women of San Quientin-by K.Lyseggen

40. Page 107 "                              "

41. Affidavit by: Yamil Navedo Ramirez-Inmate #36027-069

42. "        " Sandra Johnson-Inmate #66542-179-Inmate #

43.   AFFIDAVIT BY MARIE CASAS INMATE #                    DATED:

44. AFFIDAVIT BY LORI WEESE

45.          P.K. LANGAN #64023-061 ,1-9-13

46. FIELDS V. SMITH

47. USA  V. HARPER

48. USA V.   FLEMIMG ,H-07-513-01 ,JUNE 21,2017 JUDGE GARY H. MILLER,USDC-HOUSTON,TX.

49. JANE DOE  V. DONALD TRUMP-USDC,D.C. CIV.17-1597(CKK) 10-30-17

50. LETTER TO DONNA LANGAN,FROM TRANSGENDER LAW CENTER, 11-13-17

51. ARTICLE RE: SEXUAL ABUSE OF FEMALE/MALE PRISONERS IN FEDERAL CUSTODY IN TX,UNDATED

52. *E-mail dated  12-8-17 from Lauren Mcgauhy Journalist*

---

**UNITED STATES OF AMERICA v. RHONDA FLEMING**
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON
DIVISION
**2017 U.S. Dist. LEXIS 148696**
CRIMINAL ACTION H-07-513-01
June 21, 2017, Decided
June 21, 2017, Filed, Entered

---

**Counsel**                For Joe Corley Detention Center, Interested Party: Timothy J Flocos,
LEAD ATTORNEY, Attorney at Law, Austin, TX.

For USA, Plaintiff: Albert A Balboni, LEAD ATTORNEY, United
States Attorneys Office, Houston, TX; James L Turner, LEAD ATTORNEY, US Attorneys
Office, Houston, TX; Martha A Minnis, LEAD ATTORNEY, Office of U S Attorney, Houston,
TX; Appellate Division, U.S. Attorney's Office, Southern District of Texas, Houston, TX;
Financial Litigation, U S Attorney's Office, Southern District of Texas, Houston, TX; US
Marshal - H; US Pretrial Svcs - H; US Probation - H; Renata A Gowie, U.S. Attorney's Office
for the District of Oregon, Portland, OR; Suzanne Bradley, Harris County Attorney's Office,
Houston, TX.

**Judges:** Gray H. Miller, United States District Judge.

**Opinion**

**Opinion by:**        Gray H. Miller

**Opinion**

**Order To Transfer**

Pending before the Court are Defendant's "Motion to Reopen Section 2255 Proceeding Based on
*Buck v. Davis*" pursuant to Rules 60(b)(4) and (6) of the Federal Rules of Civil Procedure (Docket
Entry No. 1128), and a motion for judgment on the pleadings (Docket Entry No. 1129).

Having reviewed the motions, the record, matters of public record, and the applicable law, the Court
ORDERS this case transferred to the Fifth Circuit Court of Appeals as an unauthorized successive
section 2255 motion, as follows.

*Background and Claims*

The Court denied Defendant's motion for section 2255 habeas relief in 2014, and denied a certificate
of appealability ("COA"). Defendant appealed, and the Fifth Circuit Court of Appeals denied
Defendant a COA in September 2015. Defendant subsequently filed a Rule 60(b) motion for relief,
which this Court dismissed for want of jurisdiction as a successive section 2255 proceeding.
Defendant again appealed, and the Fifth Circuit again denied Defendant a COA. The Fifth Circuit
likewise denied Defendant's various other requests for mandamus relief and authorizations to file
successive section 2255 proceedings. Defendant recently filed with the Fifth Circuit Court of Appeals
yet another motion for authorization to file a successive section 2255 proceeding; the case remains
pending. *In re **Rhonda Fleming**,* C. A. No. 17-20283 (5th Cir.).

DISHOT                                           1

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the
restrictions and terms and conditions of the Matthew Bender Master Agreement.

### Analysis

Because Defendant fails to show under Rule 60(b)(4) that the Court's 2014 order denying section 2255 relief was void, the Court will focus on the request for relief under Rule 60(b)(6). Rule 60(b) vests wide discretion in courts, but relief under Rule 60(b)(6) is available only in "extraordinary circumstances." *Gonzalez v. Crosby*, 545 U.S. 524, 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480 (2005). Defendant here argues that her convictions must be reversed because of "pretrial ineffective assistance of counsel/factual innocence/prosecutorial misconduct" and denial of counsel of choice. (Docket Entry No. 1128, pp. 2-3.) These claims have been raised and rejected in Defendant's repetitive motions and proceedings before this Court and the Fifth Circuit Court of Appeals, and constitute unauthorized successive habeas claims which this Court is without jurisdiction to consider.

Defendant further argues that her prior habeas claims should be reconsidered in light of the Supreme Court's recent decision in *Buck v. Davis*, __ U.S. __, 137 S. Ct. 759, 780, 197 L. Ed. 2d 1 (2017). According to Defendant, *Buck* sets forth new standards for granting a certificate of appealability that, had this Court utilized them, would have resulted in the granting of habeas relief or a COA. Defendant is incorrect. *Buck* did not set forth new standards regarding a COA; to the contrary, the Supreme Court in *Buck* confirmed and enforced existing Supreme Court standards which this Court followed in denying Defendant a COA.

Defendant also argues that "new evidence" warrants reconsideration of her habeas claims. Again, Defendant's purported new evidence has been reviewed by this Court in prior motions and proceedings in this case, and her claims constitute unauthorized successive habeas claims which this Court is without jurisdiction to consider.

### Sanctions Warning

In this proceeding, Defendant requests habeas relief on arguments that have been previously presented to, and rejected by, this Court and the Fifth Circuit Court of Appeals. *See In re: **Rhonda Fleming**,* Case No. 14-20189 (5th Cir. May 14, 2014) (denying petition for writ of mandamus); *United States v. Fleming,* Case No. 14-20246 (5th Cir. Sept. 4, 2015) (denying COA regarding section 2255 motion); *United States v. Fleming,* Case No. 14-20474 (5th Cir. Nov. 12, 2015) (denying COA regarding Rule 60(b) motion); *United States v. Fleming,* Case No. 14-20476 (5th Cir. July 6, 2015) (dismissing petition for writ of mandamus); *In re: **Rhonda Fleming**,* Case No. 14-20530 (5th Cir. Dec. 18, 2014) (denying authorization to file successive section 2255 motion); *In re: **Rhonda Fleming**,* Case No. 15-20368 (5th Cir. Dec. 16, 2015) (denying petition for writ of mandamus); *In re: **Rhonda Fleming**,* Case No. 16-20490 (5th Cir. Oct. 24, 2016) (denying authorization to file successive section 2255 motion). Moreover, Defendant has two post-conviction proceedings pending with the Fifth Circuit involving issues raised in the instant proceeding. *See United States v. Fleming,* Case No. 16-20732 (5th Cir., filed Nov. 3, 2016); *In re: **Rhonda Fleming**,* Case. No. 17-20283 (5th Cir., filed April 21, 2017) (seeking authorization to file successive section 2255 motion).

These Fifth Circuit proceedings represent numerous post-conviction motions filed by Defendant in this Court, the overwhelming majority of which raise the same or similar issues as raised in the instant Rule 60(b) motion. Defendant's filing of repetitive claims and arguments, raising repetitive claims and arguments under guise of "new" grounds, and continuing to advance claims and arguments already rejected by the courts, constitutes malicious abuse of the judicial system that will not be allowed to continue unabated. *Pro se* litigants have "no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets." *Farguson v. MBank Houston, NA.*, 808 F.2d 358, 359 (5th Cir. 1986).

Accordingly, Defendant is warned that her persistent abuse of the judicial system by raising

DISHOT

2

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

arguments or claims that have been raised and addressed in her prior motions or proceedings before this Court or in proceedings before the Fifth Circuit Court of Appeals will result in this Court's imposition of sanctions against her, including, but not limited to, monetary penalties and limitations on her ability to file further lawsuits, motions, or pleadings. Moreover, Defendant's continued conduct in pursuing frivolous or repetitive filings regarding the same subject matter will subject her to additional and progressively more severe sanctions.

## Conclusion

The Court ORDERS that Defendant's Rule 60(b) motion (Docket Entry No. 1128) be TRANSFERRED to the Fifth Circuit Court of Appeals for further disposition as an unauthorized successive section 2255 motion. The motion for judgment on the pleadings (Docket Entry No. 1129) is DENIED. To any extent necessary, a certificate of appealability is DENIED.

Signed at Houston, Texas on June 21, 2017.

/s/ Gray H. Miller

Gray H. Miller

United States District Judge

3

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**JANE DOE 1, et al., Plaintiffs v. DONALD J. TRUMP, et al., Defendants**
**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**2017 U.S. Dist. LEXIS 178892**
**Civil Action No. 17-1597 (CKK)**
**October 30, 2017, Decided**
**October 30, 2017, Filed**

**Counsel**

For JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, DYLAN KOHERE, Plaintiffs: Kevin Matthew Lamb, LEAD ATTORNEY, WILMER, CUTLER, PICKERING, HALE & DORR, LLP., Washington, DC; Paul Reinherz Quitma Wolfson, LEAD ATTORNEY, WILMER HALE, Washington, DC; Adam M. Cambier, Christopher R. Looney, Harriet Hoder, PRO HAC VICE, WILMER CUTLER PICKERING HALE & DORR LLP, Boston, MA; Alan E. Schoenfeld, PRO HAC VICE, WILMER CUTLER PICKERING HALE & DORR, LLP, New York, NY; Amy Whelan, Christopher F. Stoll, Shannon P. Minter, PRO HAC VICE, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, CA; Claire Laporte, Daniel L. McFadden, Kathleen M. Brill, Matthew E. Miller, Michael J. Licker, Rachel C. Hutchinson, PRO HAC VICE, FOLEY HOAG, LLP, Boston, MA; Jennifer Levi, Mary L. Bonauto, PRO HAC VICE, GLBTQ LEGAL ADVOCATES & DEFENDERS, Boston, MA; Nancy Lynn Schroeder, PRO HAC VICE, WILMER CUTLER PICKERING HALE & DORR LLP, Los Angeles, CA.

For REGAN V. KIBBY, JOHN DOE, 1, Plaintiff: Kevin Matthew Lamb, LEAD ATTORNEY, WILMER, CUTLER, PICKERING, HALE & DORR, LLP., Washington, DC; Paul Reinherz Quitma Wolfson, LEAD ATTORNEY, WILMER HALE, Washington, DC; Adam M. Cambier, Christopher R. Looney, Harriet Hoder, PRO HAC VICE, WILMER CUTLER PICKERING HALE & DORR LLP, Boston, MA; Alan E. Schoenfeld, PRO HAC VICE, WILMER CUTLER PICKERING HALE & DORR, LLP, New York, NY; Amy Whelan, Christopher F. Stoll, Shannon P. Minter, PRO HAC VICE, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, CA; Claire Laporte, Daniel L. McFadden, Kathleen M. Brill, Matthew E. Miller, Michael J. Licker, Rachel C. Hutchinson, PRO HAC VICE, FOLEY HOAG, LLP, Boston, MA; Jennifer Levi, Mary L. Bonauto, PRO HAC VICE, GLBTQ LEGAL ADVOCATES & DEFENDERS, Boston, MA; Nancy Lynn Schroeder, PRO HAC VICE, WILMER CUTLER PICKERING HALE & DORR LLP, Los Angeles, CA.

For DONALD J. TRUMP, in his official capacity as President of the United States, JAMES N. MATTIS, in his official capacity as Secretary of Defense, JOSEPH F. DUNFORD, JR., in his official capacity as Chairman of the Joint Chiefs of Staff, UNITED STATES DEPARTMENT OF THE ARMY, RYAN D. MCCARTHY, in his official capacity as Secretary of the Army, UNITED STATES DEPARTMENT OF THE AIR FORCE, HEATHER A. WILSON, in her official capacity as Secretary of the Air Force, UNITED STATES COAST GUARD, ELAINE C. DUKE, in her official capacity as Secretary of Homeland Security, UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF THE NAVY, DEFENSE HEALTH AGENCY, RICHARD V. SPENCER, in his official capacity as Secretary of the Navy, RAQUEL C. BONO, in her official capacity as Director of the Defense Health Agency, Defendants: Ryan Bradley Parker, LEAD ATTORNEY, U.S. DEPARTMENT OF JUSTICE, Washington, DC.

For AMERICAN ACADEMY OF FAMILY PHYSICIANS, AMERICAN ACADEMY OF NURSING, AMERICAN COLLEGE OF PHYSICIANS, AMERICAN MEDICAL WOMEN'S ASSOCIATION, AMERICAN NURSES ASSOCIATION, ASSOCIATION OF MEDICAL SCHOOL PEDIATRIC DEPARTMENT CHAIRS,

DISHOT

1

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

ENDOCRINE SOCIETY, GLMA: HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY, NATIONAL ASSOCIATION OF SOCIAL WORKERS, PEDIATRIC ENDOCRINE SOCIETY, WORLD PROFESSIONAL ASSOCIATION FOR **TRANSGENDER** HEALTH, Movants: Scott B. Wilkens, LEAD ATTORNEY, JENNER & BLOCK LLP, Washington, DC.
For TREVOR PROJECT, Movant: Howard Sean Hogan, LEAD ATTORNEY, GIBSON, DUNN & CRUTCHER, LLP, Washington, DC.
For NATIONAL CENTER FOR **TRANSGENDER** EQUALITY, TENNESSEE **TRANSGENDER** POLITICAL COALITION, TGI NETWORK OF RHODE ISLAND, **TRANSGENDER** ALLIES GROUP, **TRANSGENDER** LEGAL DEFENSE & EDUCATION FUND, TRANSOHIO, **TRANSGENDER** RESOURCE CENTER OF NEW MEXICO, SOUTHERN ARIZONA GENDER ALLIANCE, Movants: Susan Baker Manning, LEAD ATTORNEY, Stephanie Schuster, Morgan, Lewis & Bockius LLP, Washington, DC.
For MASSACHUSETTS, Amicus: Sara A. Colb, LEAD ATTORNEY, MASSACHUSETTS ATTORNEY GENERAL'S OFFICE, Boston, MA.
**Judges:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**Opinion**

**Opinion by:**        COLLEEN KOLLAR-KOTELLY

**Opinion**

**MEMORANDUM OPINION**

(October 30, 2017)

On July 26, 2017, President Donald J. Trump issued a statement via Twitter announcing that "the United States Government will not accept or allow **transgender** individuals to serve in any capacity in the U.S. Military." A formal Presidential Memorandum followed on August 25, 2017. Before the Presidential Memorandum, the Department of Defense had announced that openly **transgender** individuals would be allowed to enlist in the military, effective January 1, 2018, and had prohibited the discharge of service members based solely on their gender identities. The Presidential Memorandum reversed these policies. First, the Memorandum indefinitely extends a prohibition against **transgender** individuals entering the military, a process formally referred to as "accession" (the "Accession Directive"). Second, the Memorandum requires the military to authorize, by no later than March 23, 2018, the discharge of **transgender** service members (the "Retention Directive").

The Department of Defense is required to submit a plan implementing the directives of the Presidential Memorandum by February 21, 2018. On September 14, 2017, Secretary of Defense James Mattis promulgated Interim Guidance establishing Department of Defense policy toward **transgender** service members until the directives of the Presidential Memorandum take effect. Pursuant to the Presidential Memorandum and the Interim Guidance, the protections afforded to **transgender** service members against discharge lapse early next year.

Plaintiffs are current and aspiring service members who are **transgender**. Many have years of experience in the military. Some have decades. They have been deployed on active duty in Iraq and Afghanistan. They have and continue to serve with distinction. All fear that the directives of the Presidential Memorandum will have devastating impacts on their careers and their families. They have moved the Court to enjoin the directives of the Presidential Memorandum, believing that these

DISHOT                                                   2

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## 2. Irreparable Injury

Next, the Court finds that Plaintiffs have demonstrated that they would suffer irreparable injury in the absence of preliminary injunctive relief. In order to satisfy the irreparable injury requirement, "[f]irst, the injury 'must be both certain and great; it must be actual and not theoretical.'" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297, 372 U.S. App. D.C. 94 (D.C. Cir. 2006) (citation omitted). "Second, the injury must be beyond remediation." *Id.*

These elements are met here. Defendants argue that "for much the same reasons they lack standing, Plaintiffs cannot show that they will suffer certain, great, or any actual injuries if the Court does not enter an injunction." Defs.' Mem. at 21. The Court has already rejected those arguments in the context of finding that Plaintiffs have standing, at least with respect to the Accession and Retention Directives, and rejects them again in this context. Absent an injunction, Plaintiffs will suffer a number of harms that cannot be remediated after that fact even if Plaintiffs were to eventually succeed in this lawsuit. The impending ban brands and stigmatizes Plaintiffs as less capable of serving in the military, reduces their stature among their peers and officers, stunts the growth of their careers, and threatens to derail their chosen calling or access to unique educational opportunities. *See Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993) (holding that plaintiff would suffer irreparable injury in the absence of preliminary injunctive relief because "plaintiff faces the stigma of being removed from active duty as a sergeant in the Marine Corps-a position which he has performed in a sterling fashion for eleven years-and labeled as unfit for service solely on the basis of his sexual orientation, a criterion which has no bearing on his ability to perform his job"). Money damages or other corrective forms of relief will not be able to fully remediate these injuries once they occur. Moreover, these injuries are also imminent, in that they are either ongoing or, at the latest, will begin when the Accession and Retention Directives take effect early next year.

These injuries are irreparable for the additional reason that they are the result of alleged violations of Plaintiffs' rights to equal protection of the laws under the Fifth Amendment. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312, 387 U.S. App. D.C. 221 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)); *see also Gordon v. Holder*, 721 F.3d 638, 653, 406 U.S. App. D.C. 6 (D.C. Cir. 2013) ("'[A] prospective violation of a constitutional right constitutes irreparable injury.'") (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346, 332 U.S. App. D.C. 436 (D.C. Cir. 1998)); *Chaplaincy*, 454 F.3d at 305 ("By alleging that Appellees are engaging in conduct that violates the Establishment Clause, Appellants have satisfied the irreparable injury prong of the preliminary injunction framework."). Under this line of authority, Plaintiffs' allegation of constitutional injury is sufficient to satisfy the irreparable injury requirement for issuance of a preliminary injunction.

DISHOT                                                        1

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Third, Defendants seem to argue that they are free of the obligation of rationalizing the Accession and Retention Directives because the directives are a mere continuation of a long71 standing policy. This is false. The Accession and Retention Directives constituted a *revocation* from **transgender** people of rights they were previously given. Before the Accession and Retention Directives, **transgender** people had already been given the right to serve openly and the right to accede by a date certain in early 2018. The Accession and Retention Directives took those rights away from **transgender** people and **transgender** people only. The targeted revocation of rights from a particular class of people which they had previously enjoyed-for however short a period of time-is a fundamentally different act than not giving those rights in the first place, and it will be the government's burden in this case to show that *this* act was substantially related to important government objectives. *See Perry v. Brown*, 671 F.3d 1052, 1079-80 (9th Cir. 2012), *vacated and remanded sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652, 186 L. Ed. 2d 768 (2013) ("Withdrawing from a disfavored group the right to obtain a designation with significant societal consequences is different from declining to extend that designation in the first place, regardless of whether the right was withdrawn after a week, a year, or a decade."). Targeted revocations of rights are a factor that has been present in a number of cases finding equal protection violations. *See Romer*, 517 U.S. at 627 (holding that law that "withdr[ew] from homosexuals, but no others, specific legal protection . . . and . . . forb[ade] reinstatement of these laws and policies" was unconstitutional); *Windsor*, 133 S. Ct. at 2695-96 (holding that the purpose of a law that "impose[d] a disability on [a] class by refusing to acknowledge a status" previously granted was to "disparage and to injure those" in that class).

Finally, Defendants argue that the military's previous study of **transgender** service cannot forever bind future administrations from looking into the issue themselves. The Court fully agrees with this point. The Court by no means suggests that it was not within the President's authority to order that additional studies be undertaken and that this policy be reevaluated. If the President had done so and then decided that banning all **transgender** individuals from serving in the military was beneficial to the various military objectives cited, this would be a different case. But as discussed above, that is not the case before the Court. The Court can only assess Plaintiffs' equal protection claim based on the facts before it. At this time, it appears that the rights of a class of individuals were summarily and abruptly revoked for reasons contrary to the only then-available studies. As explained above, based on the cumulative effect of various unusual facts, the Court is convinced that Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim. This finding in no way should be interpreted to prevent Defendants from continuing to study issues surrounding the service of **transgender** individuals in the military, as they have asserted that they intend to do.

The Court concludes this portion of its Memorandum Opinion with a caveat. This case comes before the Court on Plaintiffs' motion for a preliminary injunction and Defendants' motion to dismiss. It is accordingly still at its very earliest stages, and the record is necessarily limited. The Court's task at this time is to determine whether Plaintiffs have stated plausible claims and demonstrated a *likelihood*-not a certainty-of success based on the present record. The Court is persuaded that Plaintiffs have made these fairly modest showings, but this is not a final adjudication of the merits of Plaintiffs' claims.

## 2. Irreparable Injury

Next, the Court finds that Plaintiffs have demonstrated that they would suffer irreparable injury in the absence of preliminary injunctive relief. In order to satisfy the irreparable injury requirement, "[f]irst, the injury 'must be both certain and great; it must be actual and not theoretical.'" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297, 372 U.S. App. D.C. 94 (D.C. Cir. 2006) (citation omitted). "Second, the injury must be beyond remediation." *Id.*

DISHOT                                    1

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

directives violate the fundamental guarantees of due process afforded by the Fifth Amendment to the United States Constitution. Defendants have moved to dismiss this case, principally on the basis that the Court lacks jurisdiction. Although highly technical, these jurisdictional arguments reduce to a few simple points: the Presidential Memorandum has not effected a definitive change in military policy; rather, that policy is still subject to review; until that review is complete, **transgender** service members are protected; and any prospective injuries are too speculative to require judicial intervention.

These arguments, while perhaps compelling in the abstract, wither away under scrutiny. The Memorandum unequivocally directs the military to prohibit the accession of **transgender** individuals and to authorize their discharge. This decision has already been made. These directives must be executed by a date certain, and there is no reason to believe that they will not be executed. Plaintiffs have established that they will be injured by these directives, due both to the inherent inequality they impose, and the risk of discharge and denial of accession that they engender. Further delay would only serve to harm the Plaintiffs. Given these circumstances, the Court is in a positon to preliminarily adjudicate the propriety of these directives, and it does so here.

The Court holds that Plaintiffs are likely to succeed on their Fifth Amendment claim. As a form of government action that classifies people based on their gender identity, and disfavors a class of historically persecuted and politically powerless individuals, the President's directives are subject to a fairly searching form of scrutiny. Plaintiffs claim that the President's directives cannot survive such scrutiny because they are not genuinely based on legitimate concerns regarding military effectiveness or budget constraints, but are instead driven by a desire to express disapproval of **transgender** people generally. The Court finds that a number of factors-including the sheer breadth of the exclusion ordered by the directives, the unusual circumstances surrounding the President's announcement of them, the fact that the reasons given for them do not appear to be supported by any facts, and the recent rejection of those reasons by the military itself-strongly suggest that Plaintiffs' Fifth Amendment claim is meritorious.

Accordingly, following an exhaustive review of the record, the pleadings,1 and the relevant authorities, the Court GRANTS-IN-PART and DENIES-IN-PART Plaintiffs' Motion for Preliminary Injunction. Defendants shall be preliminarily enjoined from enforcing the Accession and Retention Directives, corresponding with sections 1(b) and 2(a) of the Presidential Memorandum, until further order of the Court or until this case is resolved. The effect of the Court's Order is to revert to the *status quo* with regard to accession and retention that existed before the issuance of the Presidential Memorandum-that is, the retention and accession policies established in a June 30, 2016 Directive-type Memorandum and later modified by Secretary of Defense James Mattis on June 30, 2017.

The Court also GRANTS-IN-PART and DENIES-IN-PART Defendants' Motion to Dismiss. The Court has jurisdiction over and reaches the merits of Plaintiffs' Fifth Amendment claim as it pertains to the Accession and Retention Directives. Plaintiffs have also challenged the Presidential Memorandum's prohibition against the expenditure of military resources on sex reassignment surgeries. Because no Plaintiff has established a likelihood of being impacted by that prohibition, the Court lacks jurisdiction to adjudicate the propriety of this directive. Finally, Plaintiffs have also claimed relief under a theory of estoppel. At this time, that claim will be dismissed without prejudice because the Amended Complaint lacks allegations of the sort of particularized representations, reliance, or government misconduct that could justify estoppel against the government. Plaintiffs may file a further amended complaint with respect to estoppel.

## I. BACKGROUND

DISHOT                                                3

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

### a. Level of Scrutiny

The general rule is that government action that treats certain classes of people differently "is presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). However, this general rule does not apply where the government action draws distinctions between individuals based on certain suspect or quasi-suspect classifications. *Id.* at 440-41. In those instances, the Court must apply a heightened degree of scrutiny. *Id.*

At this preliminary stage of the case, the Court is persuaded that it must apply a heightened degree of scrutiny to the Accession and Retention Directives. The Court reaches this conclusion for two reasons. First, on the current record, **transgender** individuals-who are alone targeted for exclusion by the Accession and Retention Directives-appear to satisfy the criteria of at least a quasi-suspect classification. "The Supreme Court has used several explicit criteria to identify suspect and quasi-suspect classifications." *Padula v. Webster*, 822 F.2d 97, 102, 261 U.S. App. D.C. 365 (D.C. Cir. 1987). The Court has observed that a suspect class is one that has "experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973)). Also relevant is whether the group has been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Id.* Finally, the Supreme Court has also considered whether the group "exhibit[s] obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S. Ct. 2727, 91 L. Ed. 2d 527 (1986).

The **transgender** community satisfies these criteria. **Transgender** individuals have immutable and distinguishing characteristics that make them a discernable class. *See, e.g.*, Medical *Amici* Brief at 3-13 (describing what it means to be **transgender**).8 As a class, **transgender** individuals have suffered, and continue to suffer, severe persecution and discrimination. *See, e.g.*, State *Amici* Brief at 3 (describing the discrimination the **transgender** community suffers); Trevor Project *Amici* Brief at 10-12, 15-16 (discussing the harmful effects of discrimination against **transgender** youth); *see also Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (holding that "[t]here is no denying that **transgender** individuals face discrimination, harassment, and violence because of their gender identity," and noting report by the National Center for **Transgender** Equality finding that 78% of students who identify as **transgender** or as gender non-conformant report being harassed while in grades K-12). Despite this discrimination, the Court is aware of no argument or evidence suggesting that being **transgender** in any way limits one's ability to contribute to society. *See* State *Amici* Brief at 2; Medical *Amici* Brief at 2; Trevor Project *Amici* Brief at 9. The exemplary military service of Plaintiffs in this case certainly suggests that it does not. Finally, **transgender** people as a group represent a very small subset of society lacking the sort of political power other groups might harness to protect themselves from discrimination. *See* Medical *Amici* Brief at 4 (noting that recent estimates suggest that **transgender** individuals make up approximately 0.6 percent of the adult population in the United States); *see also Adkins v. City of New York*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015) (noting that there is "no indication that there have ever been any **transgender** members of the United States Congress or the federal judiciary").

Although the Court is aware of no binding precedent on this issue, it has taken note of the findings and conclusions of a number of other courts from across the country that have also found that discrimination on the basis of someone's **transgender** identity is a quasi-suspect form of

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

classification that triggers heightened scrutiny. *See Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (holding that "all of the indicia for the application of the heightened intermediate scrutiny standard are present" for **transgender** individuals); *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 872-74 (S.D. Ohio 2016) (finding that "**transgender** status is a quasi-suspect class under the Equal Protection Clause"); *Adkins*, 143 F. Supp. 3d at 140 ("[T]he Court concludes that **transgender** people are a quasi-suspect class" and "[a]ccordingly, the Court must apply intermediate scrutiny to defendants' treatment of plaintiff").

Second, the Court is also persuaded that the Accession and Retention Directives are a form of discrimination on the basis of gender, which is itself subject to intermediate scrutiny. It is well-established that gender-based discrimination includes discrimination based on nonconformity with gender stereotypes. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group"). The Accession and Retention Directives' exclusion of **transgender** individuals inherently discriminates against current and aspiring service members on the basis of their failure to conform to gender stereotypes. The defining characteristic of a **transgender** individual is that their inward identity, behavior, and possibly their physical characteristics, do not conform to stereotypes of how an individual of their assigned sex should feel, act and look. *See Medical Amici* Brief at 3-13. By excluding an entire category of people from military service on this characteristic alone, the Accession and Retention Directives punish individuals for failing to adhere to gender stereotypes. *See Whitaker*, 858 F.3d at 1051 (holding that heightened scrutiny used for sex-based classifications applied to school policy requiring **transgender** student to use bathroom of sex listed on his birth certificate because it "treat[ed] **transgender** students . . . who fail to conform to the sex-based stereotypes associated with their assigned sex at birth, differently. . . . These students are disciplined under the School District's bathroom policy if they choose to use a bathroom that conforms to their gender identity"); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (holding that "discrimination against a **transgender** individual because of her gender-nonconformity is sex discrimination"); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004) (holding that the facts alleged by transsexual plaintiff to support his claims of gender discrimination on the basis of sex stereotyping "easily constitute a claim of sex discrimination grounded in the Equal Protection Clause of the Constitution"). A service member who was born a male is punished by the Accession and Retention Directives if he identifies as a woman, whereas that same service member would be free to join and remain in the military if he was born a female, or if he agreed to act in the way society expects males to act. The Accession and Retention Directives are accordingly inextricably intertwined with gender classifications.

DISHOT                                        2

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

National Headquarters
P.O. Box 70976
Oakland, CA 94612
(510) 587-9696
www.transgenderlawcenter.org

Date: November 13, 2017

Dear Donna,

Thank you for writing to Transgender Law Center. We very much appreciate your patience in awaiting a response, because our limited resources and staff don't enable us to respond to all the letters we receive from prison with the immediacy they deserve.

Would you be willing to update us on the status of the case you referenced in your letter postmarked September 7, 2017? While this letter is not a guarantee of legal representation, we would like to see what we can do to connect you with a local lawyer if you are still seeking legal assistance.

We have also enclosed the BOP's policies related to transgender people in federal custody, in the event that you do not already have access to these documents.

It is important for you to understand that this letter and any accompanying resources are legal information, not legal advice. Any legal claims you may have are likely subject to deadlines which could cause you to lose the right to pursue those claims in the future. At this time we are unable to say whether any deadlines have passed or will soon pass.

I hope this helps. Once again, I want to thank you for your patience. I am looking forward to hearing from you with any updated information that you may have.

Sincerely,

Flor Bermudez, Esq.
Detention Project Director
*Admitted in New York (Not admitted in California)*
Under the supervision of Ilona Turner, Esq., Legal Director

PS: Note that we have recently moved. Please address any future mail to the P.O. Box above.

EXHIBIT # 51

They committed sex acts with inmates they supervised inside Fort Worth federal prisons.
But the two former prison guards did not have to register as sex offenders after they admitted their crimes in court and were sentenced.
Brady Michael Green and Jose Angel Rivas bargained their way out of that requirement by pleading guilty to different, nonsexual offenses such as lying to investigators and hiding the crimes, according to court records.
State and federal sex offender registration laws require those who committed certain sex crimes to register with the state in which they live. The states, including Texas, keep searchable public databases of all registered offenders so residents can find out where they live.
In Texas, registrants are barred from living near certain places such as parks, schools and day care centers. There are also some employment restrictions.
ADVERTISING

inRead invented by Teads
Victim advocates say letting some offenders off the hook creates a double standard and is part of a pattern of leniency toward prison staffers who commit sex crimes.
"Sadly, it's not much of a surprise that these corrections officers are getting off relatively lightly," said Jesse Lerner-Kinglake, spokesman for Just Detention International, a Los Angeles-based prison human rights organization. "The mere fact that the officers are facing any legal consequences at all makes them the exception."
The U.S. attorney's office in Dallas declined to comment on the cases.
In two other sexual abuse cases involving former Fort Worth federal prison guards, their list of probation conditions did not include registering as sex offenders. One of them, Yvonne Marrufo, said her plea deal didn't require it and that she doesn't intend to register.
Green, Rivas and Marrufo are among a group of at least eight former federal prison guards across Texas who committed sexual misconduct with inmates since 2014, court records show.
A Texas Department of Public Safety spokesman told The Dallas Morning News that state law requires sex offender registration for the crime of sexual abuse of a ward. Experts said there is sometimes confusion about registration requirements.
Sex abuse
Rivas admitted in May to having an illegal romantic relationship with an inmate at the federal prison in Texarkana. He said in court papers that he kissed the prisoner multiple times and at least once touched his "genital area through his clothes for the purpose of sexual gratification."
He was charged in an indictment with abusive sexual contact of a ward and providing contraband in prison   specifically, a watch, sunglasses and headphones. But Rivas pleaded guilty to a different felony: withholding information on a crime.
Rivas received five years of probation and was not required to register as a sex offender, court records show. His attorney could not be reached for comment.
Green, a former guard at the Carswell Federal Medical Center in Fort Worth, pleaded guilty in 2014 to making a false statement to a government agency for lying about having sex with an inmate at least three times..
Green was sentenced to three months in federal prison and given one year of probation. His 19 conditions of probation did not include a requirement to register as a sex offender, records show.. His attorney could not be reached for comment.
Marrufo, 42, of Fort Worth, was sentenced last month to three years of probation for sexual abuse of a ward. The offense carries a maximum punishment of 15 years in prison and a $250,000 fine.
The federal prison in Fort Worth((David Woo/Staff Photographer))
The federal prison in Fort Worth ((David Woo/Staff Photographer))
Marrufo, a former cook supervisor at the Fort Worth federal medical prison, touched an inmate's genitals with her hand in February 2015, according to court records.
Marrufo signed a document as part of her plea agreement saying she understood she might be required to register as a sex offender under the federal Sex Offender Registration and Notification Act. A list of probation terms in her file includes the requirement that she register. But it was crossed out.
Marrufo said she was told she didn't have to register as a sex offender. She said the consequences of her actions have already been bad enough. She lost her career and her relationship and was homeless for a time, she said.
"People automatically assume you're a sexual predator," said Marrufo, who worked in corrections since 1997.

*Exhibit #52*

---------------------------------------------------------------------------------------------------

FROM: Mcgauhy, Lauren
TO: 64023061
SUBJECT: Settlement Coming
DATE: 12/08/2017 08:48:11 PM

Dear Donna and Macy,
I'm hearing the negotiations in the case involving transgender inmates may wrap up soon. The federal government will likely change prison guidelines to prohibit transgender inmates from being housed in general population. You would have to be housed separately. I wanted to get a comment from you on what you expect and hope to get out of the settlement, and what being forced to be housed separately might mean for your mental and physical health.
Thank you,
Lauren